UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MILLENNIAL SPECIALTY INSURANCE and THE BALDWIN GROUP COLLEAGUE, INC.,

Plaintiffs,

v. Case No. 8:24-cv-1661-KKM-CPT

JEFFREY HIRSCH, JULIANA ROSAS, MATTHEW MCKENNA, and LEANNA MARCIANO,

Defendants.
________________________________/

**O R D E R**

Before the Court is a motion for sanctions pursuant to Federal Rule of Civil Procedure 37(e) filed by Plaintiffs Millennial Specialty Insurance (Millennial) and The Baldwin Group Colleague, Inc. (Baldwin) against Defendants Jeffrey Hirsch, Juliana Rosas,[1] Matthew McKenna, and Leanna Marciano. (Doc. 45). For the reasons set forth below, the Plaintiffs' motion is granted in part and denied in part.[2]

---

[1] Rosas has been referred to in this action as Rosas-Litourgis (Doc. 59 at 55), and the Court will therefore refer to her by that name as well.

[2] Given the nature of the sought-after relief, the undersigned believes it appropriate to dispose of the Plaintiffs' motion by way of an Order rather than a Report and Recommendation. *See Wilson v. HH Savannah, LLC*, 2022 WL 3273718, at *9 n.14 (S.D. Ga. June 1, 2022) ("[M]agistrate judges have jurisdiction to enter sanctions orders for discovery failures which do not strike claims, completely

I.

This lawsuit centers around the Plaintiffs' allegations that the Defendants left their employ and took sensitive information with them to a competing firm, Aegis Insurance Agency, Inc. (Aegis). (Doc. 22). In their operative complaint, the Plaintiffs assert claims against one or more of the Defendants for violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), the Defend Trade Secrets Act (18 U.S.C. § 1036), and the Florida Uniform Trade Secrets Act (Fla. Stat. § 688.001), as well as for breach of contract, breach of fiduciary duty and/or the duty of loyalty, civil conspiracy, and attorneys' fees. (Doc. 22).

The Plaintiffs filed the instant motion upon learning that the Defendants either deleted or failed to preserve electronically stored information (ESI) from computers they used while working for the Plaintiffs. (Doc. 45). In their motion, the Plaintiffs ask that the Court presume at trial that the evidence allegedly spoliated by the Defendants was unfavorable to the Defendants and that the Court award the Plaintiffs the attorneys' fees and costs they incurred in prosecuting the motion, as well as the monies they expended in attempting to forensically recover the purportedly spoliated evidence. (Doc. 45). The Defendants oppose the Plaintiffs' motion. (Doc. 47).

The Court heard oral argument on matter, after which it conducted an evidentiary hearing to resolve a number of factual issues raised by the parties. (Doc. 59). At that proceeding, Defendants Hirsch, Rosas-Litourgis, McKenna, and

---

preclude defenses[,] or generate litigation-ending consequences.") (quoting *QBE Ins. Corp. v. Jorda Enters., Inc.*, 280 F.R.D. 694, 694 n.2 (S.D. Fla. 2012)).

Marciano all testified, as did the Plaintiffs' forensics expert, Daniel Gleisner. *Id.* The next day, the Court entered an Order directing the parties to file proposed findings of fact and conclusions of law "properly address[ing] all arguments they wish[ed] the Court to consider[.]" (Doc. 58). The parties have since submitted their filings in accordance with the Court's Order (Docs. 60–64), and the matter is therefore ripe for the Court's review.

II.

The following background is derived from the evidence adduced at the evidentiary hearing, as well as from other relevant information in the record. Unless otherwise indicated, this background reflects the Court's assessment of the weight of the evidence offered by the parties at the evidentiary hearing, including the witnesses' testimony.

The Defendants are former employees of a component of the Plaintiffs' business known as Scale Underwriting Services, LLC (Scale), d/b/a Millennial. (Doc. 59 at 39, 82–83); (Doc. 61 at 3). At all times relevant to this action, Scale was a "data-agile and tech-enabled managing general agent" that offered directors and officers (D&O) liability insurance and employment practices liability coverage to "high-growth and venture-backed" entities. (Doc. 45 at 4); *see also* (Doc. 59 at 16). Scale accomplished this via two programs, the Trisura Program and the Lloyd's Program. (Doc. 45 at 4). The Plaintiffs, through Scale, invested a substantial amount of time and resources in these programs and benefitted economically from them. *See id*.

Hirsch was the managing director of Scale and its highest ranking employee. *See id.* at 5; *see also* (Doc. 59 at 15, 17). He was also a licensed attorney who practiced law for more than thirty years. (Doc. 59 at 15–16). Rosas-Litourgis served immediately under Hirsch as Senior Director of Underwriting and was Scale's second highest ranking employee. (Doc. 45 at 5); (Doc. 59 at 82–83); (Doc. 61 at 4). McKenna served immediately under Rosas-Litourgis as Vice President of Underwriting and was Scale's third highest ranking employee. (Doc. 45 at 5); (Doc. 59 at 82–83); (Doc. 61 at 4). Marciano was a senior underwriter at Scale and, like McKenna, reported to Rosas-Litourgis. (Doc. 59 at 39–40).

As part of their employment at Scale, the Defendants were required to sign a "Protective Agreement" which contained a number of restrictive covenants, including—as pertinent here—a prohibition against them disclosing or otherwise using the Plaintiffs' confidential business information outside of the Plaintiffs' company. *See* (Doc. 59 at 83); (Doc. 61 at 4); (Docs. 62-6, 62-7). Also, as part of their employment, the Defendants were supplied with company computers by the Plaintiffs to assist them in performing their duties. (Doc. 59 at 28, 46, 66, 78, 88, 102). It was a "common practice" among the Plaintiffs' employees to utilize their company devices for both personal and work purposes. *Id.* at 48.

At the evidentiary hearing, the Defendants generally maintained—without any meaningful corroboration—that all emails, files, and other information located on their company computers were "stored in whatever cloud server" the Plaintiffs used. (Doc. 59 at 34, 49–51, 68–69, 96). The Plaintiffs' Managing Director of Technology

at least partially refuted this assertion in his declaration—which was admitted into evidence without objection—stating that "no backups of any of the [Defendants' relevant devices] exist on [the] Plaintiffs' internal networks or systems," and that there are no "logs that would allow [the] Plaintiffs to determine what data was saved on the laptops . . . assigned to Marciano and Rosas[-Litourgis]." (Doc. 62-23 at 3).

Irrespective of this issue, it is seemingly uncontested that items saved locally on the Defendants' company laptops or desktops were only "backed up to the cloud" if the Defendants affirmatively took steps to make sure that happened. (Doc. 59 at 51, 1-4). In addition, as Rosas-Litourgis acknowledged, the only way it can be discerned what resided locally on a company laptop is to examine the metadata[3] on that computer. *Id.* at 78. And, as the Plaintiffs' expert, Gleisner, made clear, the only way to verify that a file stored on the Plaintiffs' server is identical to a file saved on one of the Defendants' laptops is to compare the files' unique MD5 hash values, which are like "digital fingerprints." *Id.* at 106–107; *see also* (Doc. 62-23 at 3).

In or around February 2024, Hirsch began communicating with K2 Insurance Services (K2) about coming to work there. (Doc. 59 at 18). K2 is the parent company of Aegis, which—like Scale—"write[s] D&O polices" and is thus a competitor of the Plaintiffs. *Id.* at 23. In the ensuing months, Hirsch was joined in some or all his

---

[3] "Metadata is '[t]he generic term used to describe the structural information of a file that contains data about the file, as opposed to describing the content of a file.'" *Selectica, Inc. v. Novatus, Inc.*, 2015 WL 1125051, at *3 (M.D. Fla. Mar. 12, 2015) (quoting The Sedona Conference Glossary: E–Discovery and Digital Information Management (Fourth Edition)). "In other words, metadata is 'data about data.'" *Id.* (quoting The Sedona Conference Journal, Commentary on Ethics & Metadata (2013)).

communications with K2 by Rosas-Litourgis and McKenna. *Id.* at 18–19. Marciano, who talked to Rosas-Litourgis about leaving the Plaintiffs as early as March or April 2024, was eventually part of these conversations as well, at least indirectly. *Id.* at 41–45.

By in or around early May 2024, Hirsch, Rosas-Litourgis, and McKenna discussed with K2 the idea of securing indemnification in case the Plaintiffs took "legal action" against them upon their joining K2. *Id.* at 19–20, 22, 41–48, 61–62, 85. During this timeframe, Hirsch also retained a lawyer to represent him, Rosas-Litourgis, and McKenna. *Id.* at 23. Marciano was made aware of the indemnification discussions no later than the beginning of June 2024. *Id.* at 41–45.

As evidenced by these conversations and Hirsch's hiring of a lawyer, the Defendants expected their departure from Scale would be contentious. In addition to the above evidence, Hirsch acknowledged, for example, that there might be "a battle" over their resignations (Doc. 62-4 at 37), while Rosas-Litourgis recalled being concerned that leaving the Plaintiffs would lead to litigation (Doc. 59 at 67–68). Marciano similarly stated that she would be "surprised" if the Plaintiffs "didn't sue" over the Defendants' exit (Doc. 62-20), a sentiment with which McKenna agreed, *id.*

The Defendants ultimately tendered their resignations to the Plaintiffs on or about June 5, 2024, although there was some question as to what their specific end date might be. (Doc. 59 at 24, 63, 84); *see* (Doc. 61 at 2). Two days later, on June 7, 2024, Plaintiffs' counsel sent a cease-and-desist letter to each Defendant, which they received the same day via email. *See* (Docs. 62-14, 62-15, 62-16, 62-17); *see also* (Doc.

59 at 25, 46, 86); (Doc. 62-3 at 15). These letters outlined the Defendants' contractual and common law obligations to the Plaintiffs and warned that the Defendants' present and future conduct might constitute violations of the Protective Agreements they signed. *See* (Docs. 62-14, 62-15, 62-16, 62-17); *see also* (Doc. 61 at 7–8). The cease-and-desist letters also advised the Defendants that given litigation was "likely," they "ha[d] an absolute duty to preserve all evidence that [wa]s potentially relevant to" the Plaintiffs' claims against them. *See* (Docs. 62-14 at 5, 62-15 at 5, 62-16 at 5, 62-17 at 5).

The same day that these letters were sent to the Defendants (i.e., June 7, 2024), McKenna deleted multiple files from one of the two work laptops the Plaintiffs provided him. (Doc. 59 at 88). The next day, on June 8, 2024, McKenna deleted another tranche of files from the same computer or from his other one. *Id.* at 88–89. In addition, on June 10, 2024, McKenna deleted a file called "Backup (scale) Oct 2022" from a personal Dropbox (i.e., a file storage service) account, which was synchronized with at least one of his company computers.[4] *Id.* at 107; (Doc. 62-5 at 7). In total, McKenna deleted more than 240 files from his company computers. (Doc. 62-5 at 7).

To justify these measures, McKenna claims that he believed one of his work computers was gifted to him by a company executive with whom he was "close" and

[4] The Plaintiffs maintain that McKenna had a "history" of sharing their confidential information with third parties without their permission. (Doc. 61 at 21). McKenna admitted at the evidentiary hearing that he had done so on at least one occasion before resigning from Scale. (Doc. 59 at 84–85).

that, since he intended to keep this device, he selectively deleted the Plaintiffs' information from it so he would "not have possession of" that data. (Doc. 59 at 93). After finding out later, however, that the computer was not a gift, McKenna avers that he downloaded a "data recovery tool" known as Disk Drill to restore the deleted files but was unable to do so. *Id.* at 92–94. McKenna maintains that he only deleted "company-related" files which were "housed on [the Plaintiffs'] cloud" server and that he did not delete any additional files once he learned the computer did not belong to him. *Id.* at 94, 96. Irrespective of McKenna's explanation, it seems uncontested that the Plaintiffs are unable at this juncture to determine the MD5 hash values of the files deleted by McKenna and that, as a result, they cannot confirm those files exist on any of their cloud-based servers. (Doc. 59 at 106); *see* (Doc. 62-23 at 2).

With respect to Rosas-Litourgis, she conducted a factory reset of her company computer on June 7, 2024, within hours of being told by the Plaintiffs that June 7 was her last day at Scale but purportedly before she received the Plaintiffs' cease-and-desist letter that day. (Doc. 59 at 63); *see* (Doc. 62-3 at 15). Rosas-Litourgis's reset purged her computer's hard drive and rendered it impossible for the Plaintiffs to analyze that device forensically. (Doc. 59 at 102–104); (Doc. 62-23 at 2). It appears undisputed that this means the Plaintiffs cannot recover any data from the device, including data concerning whether Rosas-Litourgis copied any files from the laptop to an external device, saved information or documents locally on the laptop which was not backed up to the cloud, printed anything from the laptop before resetting it, or accessed any particular files on the laptop. (Doc. 59 at 102–104).

In defense of her conduct, Rosas-Litourgis insists that she kept sensitive personal information on her company computer, including medical records and wedding photos, and that she wiped her device to protect the confidentiality of this information. *Id.* at 70–71. Rosas-Litourgis conceded at the hearing, however, that she had already provided at least some of these medical documents to the Plaintiffs and that she had been able to remove personal files from her work computer piecemeal (i.e., without affecting the Plaintiffs' business data) prior to her factory reset. *Id.* at 64–65, 75.

Regarding Marciano, she also factory reset her work laptop, albeit on June 11, 2024. *Id.* at 46. She did so after discussing the cease-and-desist letter with McKenna, and after acknowledging to McKenna that she expected the Plaintiffs to sue them. *Id.* at 86–88. Akin to Rosas-Litourgis, Marciano claims that she took this action because she had intimate personal information on her company computer and "felt" that "wiping" it was "the most complete way to make sure that all of th[is] information" could not be accessed by anyone. *Id.* at 49–50. As with Rosas-Litourgis's reset, Marciano's reset precludes the Plaintiffs from ascertaining, inter alia, whether she copied any files from the laptop to an external device, saved data locally on the laptop that was not backed up to the server, or accessed any specific files on the laptop. *Id.* at 104–05; *see also* (Doc. 62-23 at 2).

As for Hirsch, the texts and emails on his computers were erased as a result of an "auto-delete setting" on those devices. (Doc. 59 at 27–34); (Doc. 61 at 12–13). That setting was installed by someone other than Hirsch and was programmed to

permanently eradicate his texts and emails after six months. (Doc. 59 at 26–27, 32). Although Hirsch admitted he knew, as a lawyer, that he was obligated to preserve evidence, he did not alter this setting after receiving the Plaintiffs' cease-and-desist letter. *Id.* at 27–28; (Doc. 61 at 12–13). He explained, however, that he "wasn't aware that th[e] setting was on" and that he was also not "technically savvy enough to have looked for that setting." (Doc. 59 at 31).

The Defendants went to work at Aegis soon after leaving Scale. *See* (Doc. 45 at 10). With the Defendants in their employ, Aegis began creating programs that were practically identical to the ones that the Defendants managed while at Scale. *Id.* at 4, 10–11; (Doc. 61 at 2); (Doc. 59 at 91). McKenna acknowledged at the evidentiary hearing that the Defendants helped develop much of the infrastructure behind these new Aegis programs from "scratch." (Doc. 59 at 91). McKenna also acknowledged that there were "no formal safeguards in place" at Aegis to ensure that the Defendants were not using confidential information belonging to the Plaintiffs. *Id.*

The Plaintiffs maintain that Aegis's advancements in this area were largely the product of the Defendants' unlawful misappropriation of the Plaintiffs' confidential information and trade secrets, which the Defendants obtained during their tenure at Scale. (Doc. 45 at 4); (Doc. 61 at 5). This information purportedly includes a "startup checklist" of resources that offers guidance on how to replicate Scale's operations and, potentially, a "library" of "endorsements" (i.e., possible policy modifications) used by Scale. (Doc. 59 at 75–77); (Doc. 62-3 at 12–13). Emphasizing that no backups exist for the company-owned devices the Defendants once possessed (Doc. 61 at 13), the

Plaintiffs further assert that the Defendants' spoliation of the above evidence has, among other things, deprived them of the ability to figure out what data was deleted, whether duplicates exist elsewhere, and—as to Rosas-Litourgis and Marciano—whether and to what extent they copied the Plaintiffs' files to other devices or preserved that data for use on behalf of Aegis. *See id.* at 9, 12, 13, 17, 22.

The Defendants counter that they did not intend to deprive the Plaintiffs of any discoverable information and that their alleged failure to preserve certain ESI has not prejudiced the Plaintiffs. To buttress the latter assertion, the Defendants state that they turned over their work devices to the Plaintiffs for forensic examination, that they have "produced their personal texts and emails in discovery," and that the Plaintiffs' allegedly lost data is backed up to, and thus recoverable from, cloud-based platforms and/or company servers. *See* (Doc. 60 at 3, 4, 6, 10, 11); *see also* (Doc. 59 at 33, 48–50, 68–69, 96).

III.

A.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). A district court has "broad discretion" to sanction a party for the spoliation of evidence. *Romero v. Regions Fin. Corp./Regions Bank*, 2019 WL 2866498, at *3 (S.D. Fla. July 3, 2019) (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)).

Where, as here, a court is presented with a spoliation claim involving ESI, it must look to Rule 37(e), as amended in 2015. That rule authorizes the "measures a court may employ if information that should have been preserved is lost[ ] and specifies the findings necessary to justify these measures." Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment.[5] Rule 37(e) states, in particular:

> If [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>> (A) presume that the lost information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

As this language reflects, four preliminary elements must be established for Rule 37(e) to apply: (1) there must have been a duty to preserve ESI; (2) the ESI must have been lost or destroyed; (3) the ESI must have been lost as a result of the party's failure to take reasonable steps to preserve it; and (4) the ESI must not have been restorable or recoverable through supplemental discovery. *Deligdish v. Bender*, 2024 WL 3917212,

[5] The Eleventh Circuit has stated that although the advisory committee notes are not binding upon the courts, they are afforded "great weight" in interpreting Rule 37(e). *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 2022 WL 433457, at *13 n.19 (11th Cir. Feb. 14, 2022) (quoting *Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129, 1132 (11th Cir. 2005)).

at *4 (M.D. Fla. Aug. 23, 2024) (citation omitted); *Burns v. Medtronic, Inc.*, 2017 WL 11633269, at *3 (M.D. Fla. Aug. 9, 2017) (citation omitted). If these elements are not met, a court must deny a request "for spoliation sanctions or curative measures." *Sosa v. Carnival Corp.*, 2018 WL 6335178, at *10 (S.D. Fla. Dec. 4, 2018) (internal quotation marks and citation omitted). And even where the four prerequisites are satisfied, a court may only award sanctions under subsection (e)(1) if it finds "prejudice" to another party, or under subsection (e)(2) if it finds that the spoliating party acted with the "intent to deprive" its opponent of the ESI in question. Fed. R. Civ. P. 37(e); *Title Cap. Mgmt., LLC v. Progress Resid., LLC*, 2017 WL 5953428, at *3 (S.D. Fla. Sept. 29, 2017) (citation omitted).

B.

Against this backdrop, the Court begins its analysis with the first of Rule 37(e)'s four preliminary elements—i.e., whether the Defendants had a duty to preserve the challenged data when they either deleted it or allowed it to be deleted. It is well settled that the "the duty to preserve arises when litigation is pending or reasonably foreseeable at the time of the alleged spoliation." *Ala. Aircraft Indus.*, 2022 WL 433457, at *14 (internal quotation marks and citation omitted).

Here, it is clear that this threshold was crossed prior to June 7, 2024, when the alleged spoliation commenced. (Doc. 61 at 15–16); (Doc. 59 at 19–22, 87). As detailed above, in the weeks leading up to that date, Hirsch, Rosas-Litourgis, and McKenna had all been in communication with K2 about indemnification due to concerns that the Plaintiffs would take legal action against them when they resigned from Scale.

(Doc. 59 at 19–20, 22, 41–48, 61–62, 85); (Doc. 62-12); *see also NuVasive, Inc. v. Day*, 2021 WL 9059745, at *6 n.10 (D. Mass. Aug. 23, 2021) (finding that litigation was "almost certainly reasonably foreseeable" after a spoliating defendant discussed indemnification with his new employer before leaving the plaintiff's employ) (internal quotation marks omitted). In fact, as also referenced previously, Hirsch retained a lawyer during this period to represent them in case such an eventuality occurred. *See* (Doc. 59 at 23). As for Marciano, as alluded to earlier, she was part of an email string in the beginning of June 2024 where indemnification was discussed, and she admitted at the hearing that she anticipated by then that the Plaintiffs might sue her. *Id.* at 41–45.

In addition, as further explained above, all the Defendants received cease-and-desist letters from Plaintiffs' counsel on June 7, 2024, which cautioned them about violations of their Protective Agreements, told them that a lawsuit was "likely," and instructed them that they "ha[d] an absolute duty to preserve" all potentially relevant information. *See id.* at 25, 45–46, 86; (Docs. 62-14 at 5, 62-15 at 5, 62-16 at 5, 62-17 at 5); *see also Se. Mech. Servs., Inc. v. Brody*, 2009 WL 2242395, at *3 (M.D. Fla. July 24, 2009) (concluding that the plaintiff's letter to the defendant outlining a legal conflict between the parties was sufficient to put the defendant on notice that litigation was reasonably foreseeable, thereby triggering a duty to preserve); *Pete v. Cooper*, 2025 WL 3755435, at *11 (S.D. Fla. Oct. 9, 2025) (stating that a "[p]reservation [l]etter" containing "instructions to . . . retain information" activated a potential defendant's duty to preserve); *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d

1317, 1326–27 (S.D. Fla. 2010). Although Rosas-Litourgis asserts that she did not receive the cease-and-desist letter on June 7 until after she factory reset her laptop (Doc. 62-3 at 15), it strains credulity that she did not reasonably anticipate litigation by then given the circumstances presented, including her indemnification conversations with K2 and the fact that she, Hirsch, and McKenna were all represented by counsel. (Doc. 59 at 67–68). Notably, neither Rosas-Litourgis nor any of the other Defendants appear to contest that they reasonably anticipated litigation at the time the challenged ESI was erased from their work computers. *See* (Doc. 63 at 1–2) (stating that "the issues here are whether any information lost is not recoverable from other sources and whether it was deleted with an intent to deprive") (emphasis omitted). The Defendants thus had a duty to preserve this data when they either eliminated it or allowed it to be eliminated.

The second element—i.e., whether the ESI at issue is lost or destroyed—can be readily disposed of. It is undisputed that the data in question was either intentionally deleted or "wiped" by the Defendants or, in the case of Hirsch, was automatically removed from his work computer by an auto-delete function that he failed to deactivate. (Doc. 59 at 27–28, 32, 102–06). Nor does it appear from the uncontested declaration of the Plaintiffs' Managing Director of Technology that there are any backup files for the Defendants' devices on the Plaintiffs' internal networks or systems. (Doc. 62-23 at 2). As such, and because the Defendants also do not contest this element (Doc. 63 at 1–2), the Court finds that it is met as well.

The third factor the Court must address is whether the Defendants took reasonable steps to preserve the challenged ESI. While Rule 37(e) does not specify what constitutes "reasonable steps" for purposes of preservation, the advisory committee explains that such efforts do "not call for perfection." Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment. Rather, the committee instructs that a "court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts." *Id*. That said, where, as here, a party purposefully deletes information, it is deemed not to have taken reasonable steps to safeguard it. *See Deligdish*, 2024 WL 3917212, at *5 (presuming that an intentional deletion of ESI means that the deleting party failed to take reasonable steps to preserve the ESI); *Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288, at *9 (M.D. Fla. Oct. 28, 2019) (same); *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 742 (N.D. Ala. 2017) (same), *aff'd,* 2022 WL 433457 (11th Cir. Feb. 14, 2022).

Applying these principles here, it is evident that Rosas-Litourgis, McKenna, and Marciano did not take reasonable steps to protect the information they intentionally deleted. The Court finds that Hirsch did not take reasonable steps either, albeit for different reasons.

The Eleventh Circuit has ruled that a failure to take reasonable steps need not be affirmative. *See Skanska USA Civil Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1314 (11th Cir. 2023) (noting that failing to act to prevent deletions can satisfy the "reasonable steps" element). Consistent with this ruling, courts in this Circuit and elsewhere have found that once a party reasonably anticipates litigation, it should

suspend practices that automatically delete potential evidence and "ensure the preservation of relevant [information]." *See In re Skanska USA Civ. Se. Inc.*, 340 F.R.D. 180, 186–87 (N.D. Fla. 2021) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)) (internal quotation marks omitted); *see also Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 233 (D. Minn. 2019) (determining that the parties failed to take reasonable steps to preserve ESI when they did not shut-off an auto-delete function); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 108 (E.D. Va. 2018) ("[A] party generally must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.") (cleaned up).

Because Hirsch did not deactivate the auto-delete setting on his work computer once he reasonably anticipated litigation, he failed to take reasonable steps to prevent the spoliation of the pertinent ESI. This conclusion is especially warranted given that Hirsch is a high-level executive and an attorney who, by his own admission, is well aware of his "obligation to preserve evidence." *See* (Doc. 59 at 31); *see also Drummond Co., Inc. v. Collingsworth*, 2025 WL 1450707, at *8 (N.D. Ala. May 20, 2025) (stating that "experienced lawyers" who were also "sophisticated parties" "may be held to a higher standard than the average litigant when considering what evidence they should have maintained in anticipation of litigation"). As with the first two elements, the Defendants do not contest this prong either. *See* (Doc. 63 at 1–2).

The final element that the Court must resolve is whether the allegedly spoliated information can be recovered or restored. Because ESI "often exists in multiple

locations, loss from one source may often be harmless when substitute information can be found elsewhere." Fed. R. Civ. P. 37, advisory committee notes to 2015 amendment. Accordingly, "Rule 37(e) precludes any sanctions or curative measures if the ESI can be restored or replaced through additional discovery." *Living Color Enters., Inc. v. New Era Aquacultures, Ltd.*, 2016 WL 1105297, at *5 (S.D. Fla. Mar. 22, 2016).

As for which party bears the burden on this element, some courts take the position that a Rule 37(e) movant typically bears the burden on such spoliation issues, *see, e.g.*, *Scarpati v. Fla. Highway Safety & Motor Vehicles*, 2021 WL 7501822, at *5 (M.D. Fla. Nov. 17, 2021) (citations omitted), while other courts adopt a more nuanced view, *see, e.g.*, *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 979 (N.D. Ill. 2021). In *DR Distributors*, for example, the court observed that "burdens of proof generally fall on the party with better access to the information," and it expressed reservations about placing the onus on the movant to show that lost ESI could not be restored or replaced where the party possessing the ESI "unquestionably destroyed" it. *Id.* (citing *Schaffer v. Weast*, 546 U.S. 49, 60 (2005)).

Even if the Plaintiffs bear the burden on this element, the Court finds that they have satisfied that burden. Starting with Rosas-Litourgis, McKenna, and Marciano, their common defense appears to be that the data they deleted was backed up to a company-wide server and thus remains available to the Plaintiffs. (Doc. 60 at 3–4, 6). There are several problems with this contention.

As an initial matter, it ignores the fact that items saved locally on the Defendants' work computers would not be stored on the company server unless the Defendants affirmatively took steps to make sure that happened. (Doc. 59 at 51). And the Defendants do not aver that they undertook such a measure. *See Doe v. Willis*, 2023 WL 2918507, at *13–14 (M.D. Fla. Apr. 12, 2023) (noting that only the party accused of spoliation knows the true contents of what was spoliated).

Putting aside this matter, the Plaintiffs are unable to identify what data was lost from Rosas-Litourgis's and Marciano's company laptops because they cannot conduct a complete forensic examination of those devices. *See* (Doc. 64 at 18); *see also* (Doc. 59 at 102–104); (Doc. 62-5 at 10); (Doc. 62-23). As a result, they cannot confirm whether, prior to the factory reset, Rosas-Litourgis and Marciano transferred any files from their laptops to an external device, printed anything from the laptop, or accessed any particular files on the laptop. (Doc. 59 at 102–104).

Moreover, as referenced previously as well, there are no backups of Rosas-Litourgis's and Marciano's work computers on the Plaintiffs' internal networks and systems. (Doc. 62-23 at 2). In addition, even if the Plaintiffs were to able secure duplicates of every file erased by Rosas-Litourgis and Marciano when they wiped their devices, the Plaintiffs would still not have the metadata allowing them to ascertain whether Rosas-Litourgis and Marciano made copies of the Plaintiff's confidential information to utilize at their new jobs with Aegis. *See* (Doc. 59 at 104–05); (Doc. 62-5 at 10); (Doc. 62-23); *see also Selectica*, 2015 WL 1125051, at *6 ("[I]n cases involving the alleged theft and misuse of [ESI], the parties may very well utilize metadata to

establish their claims and defenses."). Indeed, as Rosas-Litourgis testified and as highlighted earlier, the "only way [the Plaintiffs] would know what resided" on her company laptop when she "w[as] negotiating with [Aegis] is if [the Plaintiffs] could look on the laptop and get the [now-destroyed] metadata." (Doc. 59 at 78, 103); *see also Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 2012 WL 10817204, at *9 (M.D. Fla. Nov. 30, 2012) (finding spoliation sanctions "warranted" after a party tampered with metadata which, if left "accurate . . . could have assisted [the plaintiff] in proving its case").

Similarly, although the Plaintiffs apparently have a list of the files deleted from at least one of McKenna's work computers, *see, e.g.,* (Doc. 62-5 at 15–78),[6] they are unable to obtain MD5 hash values that would permit them to determine whether duplicate versions of the files are present elsewhere on their networks (Doc. 59 at 105–108); (Doc. 62-23). *See Jones v. Life Care Ctrs. of Am., Inc.*, 2022 WL 4389727, at *39 (M.D. Fla. Aug. 11, 2022) (recommending that sanctions be granted for the spoliation of "metadata important to determine" case issues), *report and recommendation adopted*, 2022 WL 4384175 (M.D. Fla. Sept. 22, 2022). Furthermore, as with Rosas-Litourgis and Marciano, there are no backups of McKenna's work computers on the Plaintiffs' internal networks and systems. (Doc. 62-23 at 2). The Defendants do not meaningfully address these issues in their post-hearing submissions. (Docs. 60, 63).

[6] It is unclear whether McKenna deleted files from one or both computers, and he does not address this question, including in averring that he believed one of the two laptops was a gift.

As for Hirsch, while the Plaintiffs acknowledge that it may be "theoretically" possible to recover his lost texts and messages from other sources (Doc. 61 at 19), they maintain that "it is impossible for [them] to identify the full scope of [the] spoliated ESI" (including the details from those communications) since they will never know the extent of what has been eliminated in the first place. *See* (Doc. 64 at 10). As one court observed in an analogous situation:

> [The defendant's] argument that [the plaintiff] can restore or replace any lost ESI by downloading it directly from [the plaintiff's] servers or getting emails from other . . . sources . . . completely misses the point. While [the plaintiff] could conceivably attempt to piece together the larger puzzle of what might have been on [the defendant's device] or in his email accounts through other sources, [the plaintiff] can never know for sure [that it has gotten back everything that was lost] without direct access to these [now-compromised] ESI sources.

*Ahrens Enters., Inc. v. Winning*, 2019 WL 12520080, at *4 (S.D. Fla. Apr. 18, 2019). Seemingly compounding this problem is the lack of any backup of Hirsch's work computer on the Plaintiffs' internal networks and systems. *See* (Doc. 62-23 at 2); *see also Willis*, 2023 WL 2918507, at *13–14 (recognizing that only the spoliator can really know the definitive scope of what has been lost); *Skanska*, 340 F.R.D. at 187 (deeming spoliated text messages to be unrestorable and irreplaceable because "[a]t best, [the defendant] can merely represent that [at least some] of the text messages . . . were produced from other custodians. Thus, '[the details on the precise contents of these messages] will never be known . . . because it is impossible to know what [they were]'" from an objective standpoint) (quoting *Paisley Park*, 330 F.R.D. at 235); *cf. Living Color*,

2016 WL 1105297, at *5 (finding that even where the "great majority" of missing text messages were provided by another party and therefore were not "lost," it was appropriate to continue the Rule 37(e) analysis since "it appear[ed] that at least some of the text messages at issue were not replaced") (internal quotation marks omitted).

In light of all the above, the Court finds that the allegedly spoliated information cannot be recovered or replaced through additional discovery.

C.

Having found that the preliminary elements of Rule 37(e) are met, the Court must decide whether the Plaintiffs have made a sufficient showing for the imposition of sanctions under subsections (e)(1) and/or (e)(2). Fed. R. Civ. P. 37(e)(1), (2); *Title Cap. Mgmt.*, 2017 WL 5953428, at *3. As there is authority that these provisions operate independently of each other,[7] the Court will address them separately.

As noted above, Rule 37(e)(1) provides that where a court makes a finding of "prejudice to another party from loss of information," it "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). To assesses "prejudice from the loss of information," a court must necessarily examine the information's significance to the instant litigation. *See* Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment ("[E]fforts to restore or replace lost information through discovery should be proportional to the apparent importance of the lost

[7] *See* Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment (noting that Rule 37(e)(2) "does not include a requirement that the court find prejudice to the party deprived of the information"); *see also Willis*, 2023 WL 2918507, at *6 (collecting cases).

information to claims or defenses in the litigation[.]"); *see also Nationwide*, 2019 WL 5700288, at *11 (noting that the "[i]mportant questions" for the Rule 37(e)(1) prejudice inquiry include "the scope of the prejudice and the importance of the spoliated ESI").

There is a disagreement, however, as to what actually amounts to "prejudice" under Rule 37(e)(1). Some courts in the Eleventh Circuit, for example, "have suggested that a non-spoliating party suffers 'prejudice' under Rule 37(e) if the unavailable ESI would have helped evaluate the merits of its positions, regardless of whether the ESI would be favorable [to] its case." *Wilson*, 2022 WL 3273718, at *7 (citations omitted). Other courts, by contrast, insist that the moving party demonstrate the spoliated evidence "would [have] affirmatively support[ed] the movant's claim." *Id.* at *7 n.11 (citation omitted).

Irrespective of what standard is employed, it is well accepted that discerning what ESI was lost and the probative value of that information can be quite vexing. As a result, neither party is automatically assigned the burden of proof on the issue of prejudice under Rule 37(e)(1). As the Advisory Committee explains:

> Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations.

Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment.

In accordance with this reasoning, Rule 37(e) affords a court discretion to decide how best to evaluate prejudice in an individual case. *Id.* This flexible approach reflects a recognition that "[t]ypically, only the spoliator knows how much prejudice has been caused by the destruction." *Nationwide*, 2019 WL 5700288, at *10 (citation omitted). Even where sanctions under Rule 37(e)(1) are appropriate, however, they may—as described above—be "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment.

Here, the Plaintiffs assert that their case "hinges largely on the claim that the Defendants breached their Protective Agreements and applicable law by misappropriating [the] Plaintiffs' confidential information and trade secrets to get a head start on their new insurance lines at Aegis (among other things)." (Doc. 61 at 24). They further assert that "whether and to what extent the Defendants downloaded, printed, or otherwise transferred data from [the] Plaintiffs' company-owned laptops is of critical importance in this action." *Id.* at 24–25. The Plaintiffs accordingly argue that because each Defendants' actions involve at least some permanent data deletion, "[the] Plaintiffs cannot tell what data was taken" and thus are "severely prejudiced by the spoliation." *Id.* at 25.

Rosas-Litourgis, McKenna, and Marciano dispute the Plaintiffs' claim of prejudice, contending—as they did above—that much, if not all, of the Plaintiffs' deleted emails, files, and other information remain accessible on the Plaintiffs' cloud-based company platforms. (Doc. 60 at 10–11). This assertion misses one of the main points of the Plaintiffs' motion. As explained before, Rosas-Litourgis's and

Marciano's factory resets and McKenna's selective deletions have effectively stymied the Plaintiffs' efforts to discover what proprietary information has been shared with Aegis because Rosas-Litourgis's, McKenna's, and Marciano's spoliations have caused the irreversible loss of metadata and meaningful MD5 hash values.[8] It is noteworthy in this respect that the Defendants admit that they have supplied Aegis with valuable information, like an insurance startup checklist containing information about the Plaintiffs' policy endorsements. (Doc. 59 at 76–77). The Court thus finds that the absent metadata and MD5 hash values—which are unknowable at this juncture due to Rosas-Litourgis's, McKenna's, and Marciano's intentional actions—would have assisted in the Plaintiffs' evaluation of the merits of their position and affirmatively supported their claims by enabling them to track the transmission of pertinent files and other confidential information. *See* (Doc. 61 at 24–25); *see also Classic Soft Trim, Inc. v. Albert*, 2021 WL 720435, at *6 (M.D. Fla. Feb. 10, 2021) ("[P]rejudice exists where documents that are relevant to a claim are unavailable and the moving party has come forward with a plausible, good faith suggestion as to what the evidence might have been.") (quoting *Goldrich v. City of Jersey City*, 2018 WL 4492931, at *10 (D.N.J. July 25, 2018)). And because the Plaintiffs' capacity to prosecute their claims is now "considerably weakened" due to the absence of this ESI, *Jones,* 2022 WL 4389727, at *39, Rosas-Litourgis's, McKenna's, and Marciano's conduct has prejudiced the

[8] *See Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 578 (M.D. Fla. 2009) (including hash values within a discussion of metadata preservation), *aff'd in part and quashed in part on other grounds*, 2009 WL 5606058 (M.D. Fla. Nov. 16, 2009).

Plaintiffs, *Willis*, 2023 WL 2918507, at *12, 14 (finding that the loss of metadata resulted in prejudice to the opposing party under Rule 37(e)(1) since that metadata "could have bolstered its defense"); *Nationwide*, 2019 WL 5700288, at *9, 11 (concluding that a finding of prejudice was warranted under Rule 37(e)(1) where metadata that "likely would have helped [a plaintiff's] claims" was "destroyed" and could not "be retrieved from another source"). Rosas-Litourgis, McKenna, and Marciano do not persuasively refute the Plaintiffs' assertions about the missing metadata and MD5 hash values or explain why the loss of this ESI does not inhibit the Plaintiffs' prosecution of this action.

Hirsch's emails and texts present a closer question. Although the Plaintiffs summarily assert that the Defendants' actions prejudiced them, they tellingly only mention Rosas-Litourgis, McKenna, and Marciano by name in advancing that argument in response to the Defendants' proposed findings of fact and conclusions of law. *See* (Doc. 64 at 10–11). Further, as described above, the Plaintiffs frame the nature of the prejudice as centering on "whether and the extent the Defendants downloaded, printed, or otherwise transferred data from [the] Plaintiffs' company-owned laptops." (Doc. 61 at 24–25). This contention does not appear to apply to Hirsch's auto-deleted emails and texts. The Plaintiffs also do not convincingly explain why the evidence that Hirsch has produced in discovery is "[in]sufficient to meet the[ir] needs" relative to him specifically. *Living Color*, 2016 WL 1105297, at *6. In short, the Plaintiffs do not make a concrete and plausible showing demonstrating that Hirsch's spoliation has prejudiced them. *Scarpati*, 2021 WL 7501822, at *5 (finding

no prejudice under Rule 37(e)(1) where there was not concrete showing that the missing evidence would help the plaintiff's claims); *Nationwide*, 2019 WL 5700288, at *10 ("To show prejudice resulting from the spoliation, a party must . . . come forward with plausible, concrete suggestions as to what the destroyed evidence might have been.") (citing *Moody v. CSX Transp.*, Inc., 271 F. Supp. 3d 410, 430 (W.D.N.Y. 2017)) (cleaned up); *see also Willis*, 2023 WL 2918507, at *14 (same); *Classic Soft Trim*, 2021 WL 720435, at *6 ("Prejudice exists where documents that are relevant to a claim are unavailable and the moving party has come forward with a plausible, good faith suggestion as to what the evidence might have been.") (quoting *Goldrich v. City of Jersey City*, 2018 WL 4492931, at *10 (D.N.J. July 25, 2018)) (cleaned up).

D.

Rule 37(e)(2) "authorizes courts to use specified and very severe measures to address or deter failures to preserve [ESI], but only on finding that the party that lost the information acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment. Thus, it is not enough for a Rule 37(e)(2) movant to establish that the spoliating party was negligent or even grossly negligent. *Id.* That said, a showing of bad faith can be adequate to trigger the remedies available under subsection (e)(2). *See Skanska*, 75 F.4th at 1312 (stating that Rule 37(e)(2)'s intent to deprive requirement is the "equivalent of bad faith" and generally means the destruction of information or items "for the purpose of hiding adverse evidence") (citing *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020)) (internal quotation marks omitted); *Ala. Aircraft*

*Indus.*, 2022 WL 433457, at *15 (observing that Rule 37(e) is "less clear . . . in providing affirmative guidance as to what sort of evidence would support a finding of an intent to deprive" but applying the bad faith standard); *Skanska*, 340 F.R.D. at 188 (equating an intent to deprive with bad faith).

A party can demonstrate a spoliator's intent to deprive via direct or circumstantial evidence. *See Calixto v. Watson Bowman Acme Corp.*, 2009 WL 3823390, at *16 (S.D. Fla. Nov. 16, 2009). As to the latter, a number of courts in this Circuit have identified the following as hallmarks of bad faith and an intent to deprive:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*See Ala. Aircraft*, 319 F.R.D. at 746 (citing *Managed Care Sols., Inc.*, 736 F. Supp. 2d at 1323); *see also Pete*, 2025 WL 3755435, at *10 (citation omitted); *Skanska*, 340 F.R.D. at 188 (citations omitted); *Fed. Trade Comm'n v. F&G Int'l Grp. Holdings, LLC*, 339 F.R.D. 325, 332 (S.D. Ga. 2021) (citation omitted).[9] "The party seeking the sanctions must establish all four of these factors where there is no direct evidence of bad faith." *Managed Care Sols., Inc.*, 736 F. Supp. 2d at 1323 (citation omitted).

---

[9] *Cf. Tripp v. Walmart, Inc.*, 2023 WL 399764, at *4 (M.D. Fla. Jan. 25, 2023) (stating the courts consider the above four factors and also "often consider whether the subject evidence was disposed of pursuant to policy as well as the reasonableness of an alleged spoliator's actions in light of the claim at issue") (citation omitted).

If a court determines that there was an intent to deprive, it may employ any of the sanctions listed in subsection (e)(2). Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment. These sanctions include the court "presum[ing] that the lost information was unfavorable to the [spoliating] party," "instruct[ing] the jury that it may or must presume the information was unfavorable to the [spoliating] party," or "dismiss[ing] the action or enter[ing] a default judgment." Fed. R. Civ. P. 37(e).

A court need not adopt any of these measures, however. *Tripp,* 2023 WL 399764, at *3 n.5 (quoting Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment). All that is required is that the chosen sanction "fit the wrong[.]" *Id*. (quoting Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment). The Eleventh Circuit has cautioned though that "the most severe" of the available sanctions under subdivision (e)(2)—dismissal of an action—should be employed only where there is a demonstration of bad faith and where lesser measures are inadequate. *Flury*, 427 F.3d at 944.

The Court begins its Rule 37(e)(2) analysis with Hirsch. After careful review, the Court finds that the evidence before it does not support a finding that Hirsch intended to deprive the Plaintiffs of the spoliated evidence. The Court credits Hirsch's testimony that he did not install the auto-delete setting on his devices, that he "wasn't aware that th[is] setting was on," and that he was not "technically savvy enough to have looked for that setting." (Doc. 59 at 31–33). Although it is true that Hirsch is an attorney and knew he had an obligation to preserve evidence, *id.* at 31, the Plaintiffs have shown that at most he was grossly negligent in failing to fulfill his obligation here.

*See Living Color*, 2016 WL 1105297, at *6 (finding negligence instead of bad faith where "it is common practice amongst many cell phone users to [auto-]delete text messages. . . . There is nothing nefarious about such a routine practice[.]"); *Mod. Remodeling, Inc. v. Tripod Holdings, LLC*, 2021 WL 3852323, at *14 (D. Md. Aug. 27, 2021) (concluding that "the failure to turn off an auto-delete setting alone is insufficient to find intent" when it comes to Rule 37(e)(2)) (citation omitted); *see also Ayers v. Heritage-Crystal Clean, LLC*, 2022 WL 2355909, at *3 (N.D. Ill. June 1, 2022) (stating that while a certain party "should have known better, the [c]ourt does not [find that the party] deleted the ESI with any nefarious purpose in mind"). The Court notes in this respect that other decisions in which courts have found bad faith due to a failure to turn off auto-delete settings have typically involved far more egregious circumstances. *See*, *e.g.*, *Skanska*, 340 F.R.D. at 189 (citing cases where the parties spoliated evidence in bad faith by not only failing to disengage auto-delete settings but also by wiping their phones and other personal devices around the time a lawsuit was filed against them); *Paisley Park*, 330 F.R.D. at 236–37 (finding an intent to deprive where the parties "failed not only to turn off the auto-delete function when they anticipated litigation[, but also] . . . wiped and discarded their phones . . . after [the p]laintiffs filed suit").[10]

[10] The decision in *Nuvasive, Inc. v. Absolute Med., LLC*, 2021 WL 3008153 (M.D. Fla. May 4, 2021), to which the Plaintiffs cite, is readily distinguishable. In that case, the attorney who was the subject of a Rule 37(e)(2) sanctions request affirmatively "instructed" a defendant to close an email domain which resulted in the irretrievable loss of evidence. *Id.* at *5, 8.

The fact that—as the Plaintiffs point out—Hirsch sent a text in February 2025 saying he wanted to "fuck [S]cale by getting [their] new broker fired" (Doc. 62-22) does not dictate a different result. While this communication reflects poorly on Hirsch, it does not undermine his testimony about his ignorance of the auto-delete function. This is especially true given that the text was transmitted well after the challenged auto-deletions occurred and well after the Plaintiffs filed suit. *Compare Ala. Aircraft*, 2022 WL 433457, at *15 (affirming a district court's finding of spoliation under Rule 37(e)(2) at least in part based on "the context of the deletion" and the fact that the defendant's incentives to harm the plaintiff were present at the time of the spoliation and motivated it).

Turning to Marciano, the Court likewise concludes that there is not enough evidence demonstrating she possessed the requisite intent to deprive when she reset her work computer. Several considerations lead the Court to this conclusion. As an initial matter, consistent with the common practice amongst the Plaintiffs' employees (Doc. 59 at 48), Marciano used her company laptop for non-work purposes and, in doing so, stored a significant amount of personal information on her device, including "banking login information," a "copy of [her s]ocial [s]ecurity card," and other sensitive materials. (Doc. 59 at 49–50). When faced with the choice between wiping everything from her computer or just her personal information, Marciano credibly testified that she deemed the former to be the safer option because it posed less of risk that she would forget some intimate data and thereby render it accessible to others in the company. *See id.* at 50; *see also Silverstein v. Boehringer Ingelheim Pharms., Inc.*, 2020

WL 13119102, at *11 (S.D. Fla. Aug. 5, 2020) (determining that a litigant's ESI deletions were no more than negligent where the litigant offered a credible explanation that did not suggest willful deprivation); *N. Am. Sci. Assocs., LLC v. Conforti*, 2024 WL 4903753, at *24–25 (D. Minn. Nov. 27, 2024) (declining to find that a party had an intent to deprive where the party's justification for the ESI destruction was credible); *United Healthcare Servs., Inc. v. Rossel*, 2024 WL 1252365, at *13 (N.D. Tex. Mar. 21, 2024) (same).

Moreover, as the lowest-ranking Defendant and seemingly the only non-executive, Marciano does not appear to be as sophisticated as the other Defendants and is therefore more deserving of being afforded the benefit of the doubt in evaluating the motives behind her conduct. *See Living Color*, 2016 WL 1105297, at *6 (considering a litigant's "relative[ ] unsophisticat[ion]" in concluding that he was "[a]t worst, . . . negligent" when he deleted ESI). This was borne out by her testimony as well. With this in mind, when Rosas-Litourgis—who was Marciano's supervisor and the second-in-command at Scale—informed Marciano that she had wiped her work computer, it would have been reasonable for Marciano to assume that it would not be improper for her to follow Rosas-Litourgis's lead and to do so as well. Although this does not absolve Marciano of her intentional deletion of the evidence on her company laptop, it militates against finding that she had an intent to deprive. *See Silverstein*, 2020 WL 13119102, at *11 (declining to find intentional deletion as tantamount to spoliation with an intent to deprive under Rule 37(e)(2)); *Living Color*, 2016 WL 1105297, at *6 (same); *Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *21 (S.D.N.Y. June 20,

2019) ("[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence.") (internal quotation marks and citation omitted).

The Court does not view Rosas-Litourgis's factory reset as charitably given the evidence before it, including Rosas-Litourgis's testimony. On its face, Rosas-Litourgis's explanation for implementing this measure is akin to Marciano's, in that she wanted to protect her personal information. As discussed previously, Rosas-Litourgis testified in this regard that she had stored wedding photos, medical documents, and other sensitive information on her work computer. (Doc. 59 at 72, 74). Rosas-Litourgis's circumstances, however, are materially different from Marciano's for several reasons.

To start, while Rosas-Litourgis claims that she elected to do a total reset instead of individually removing her personal files because it was more "efficient," *id.* at 74, she had little trouble on prior occasions removing personal and other information from her company laptop in piecemeal fashion, *id.* at 67, 75, 78. Additionally, Rosas-Litourgis acknowledged that she had already supplied the Plaintiffs with a fair amount of the sensitive medical documentation on her device (Doc. 59 at 64–65), which undercuts her purported need to delete those materials. This evidence calls into question Rosas-Litourgis's credibility. *See Ala. Aircraft*, 319 F.R.D. at 746 (finding that the spoliators' actions were not "credibly explained" when knew they how to preserve the information at issue but did so for only some of it).

Furthermore, during this case, Rosas-Litourgis has downplayed the fact that she was aware at the time of her factory reset that she could be sued, pointing out that she is not a lawyer. *See*, *e.g.*, (Doc. 62-3 at 17). Her claimed ignorance of this risk, however, is undermined by her sustained interest in securing indemnification from K2 in the event that litigation would occur upon her departure from Scale. *See id.*; (Doc. 59 at 61, 67); *see also NuVasive*, 2021 WL 9059745, at *6 (finding that litigation was "almost certainly reasonably foreseeable" after a spoliating defendant discussed indemnification with his new employer before leaving the plaintiff's employ).[11]

Rosas-Litourgis's claimed ignorance is also difficult to square with her position at Scale. As noted above, she was the second highest-ranking executive at Scale and oversaw staff like McKenna and Marciano. *see* (Doc. 59 at 15, 82–83). Moreover, it seems that the nature of her business at Scale involved, at least in part, assessing litigation risk. All of this makes Rosas-Litourgis a sophisticated litigant, a conclusion which is bolstered by the Court's evaluation of her testimony. *See Deerpoint Grp., Inc. v. Agrigenix, LLC*, 2022 WL 16551632, at *9 (E.D. Cal. Oct. 31, 2022) (determining that a high-ranking corporate employee was a sophisticated litigant within the context of Rule 37(e)); *Aramark Mgmt., LLC v. Borgquist*, 2021 WL 864067, at *16 (C.D. Cal. Jan. 27, 2021) (observing that a company's business consultant and director were sophisticated litigants for purposes of the court's Rule 37(e) analysis), *report and*

[11] The Court assumes, without deciding, that Rosas-Litourgis received the Plaintiffs' cease-and-desist letter after her factory reset. Even so, it is hard to fathom that she did not at least learn of the letter's existence beforehand from either Hirsch, McKenna, or Marciano, especially given how coordinated their resignations were.

*recommendation adopted,* 2021 WL 863746 (C.D. Cal. Mar. 8, 2021). Courts in this Circuit and elsewhere have found an intent to deprive where sophisticated litigants purposefully deleted ESI after anticipating litigation and without a credible alternative explanation. *See Skanska*, 75 F.4th at 1313 (upholding the court's assessment that a party spoliated evidence in bad faith where there was a "lack of [a] cogent explanation" for its failure to preserve evidence); *Ala. Aircraft*, 319 F.R.D. at 746; *see also Peddada v. Cath. Health Initiatives Colorado*, 2026 WL 35172, at *4–6 (D. Colo. Jan. 6, 2026) (deeming an intent to deprive existed under Rule 37(e)(2) where the plaintiff, a "sophisticated professional," intentionally deleted ESI after he was terminated by his former employer); *Nuvasive, Inc. v. Absolute Med., LLC*, 2023 WL 11910763, at *9–10 (M.D. Fla. Nov. 22, 2023) (finding that a litigant's "sophistication" was probative of whether their spoliation qualified for Rule 37(e)(2) sanctions).

In sum, the Court finds that Rosas-Litourgis acted with an intent to deprive when she factory reset her laptop and that the imposition of Rule 37(e)(2) sanctions against her is warranted.

Proceeding to McKenna, it is similarly uncontested that he affirmatively deleted more than 240 files from his company laptop(s). (Doc. 59 at 88–89). His justification for doing so—as described before—is that he thought that at least one of his work computers belonged to him because it was supposedly a gift from a close colleague and that he wanted to make sure he could not access the Plaintiffs' confidential information when he left Scale to work for Aegis. *Id.* at 92–93. McKenna further asserts that after learning during the discovery phase in this litigation that the laptop was not a gift, he

installed the Disk Drill software to recover the files but was unsuccessful. *Id.* at 92–94. McKenna also asserts that once he realized his "error" as to who owned the laptop, he ceased deleting files because he "[did not] want to make a problem worse." *Id.* at 94.

The Court does not find McKenna's explanation to be credible. If, as McKenna claims, he did not find out until discovery in this lawsuit that one laptop was not his, this revelation would have occurred well after he deleted the files and well after this case was initiated in July 2024. This timeline conflicts with the forensic analysis of one of McKenna's computers, which shows that Disk Drill was downloaded in June 2024. *See* (Doc. 62-5 at 8); *see also Skanska*, 340 F.R.D. at 189–91 (finding bad faith where the spoliator could not provide a plausible explanation for their spoliation); *Safelite Grp., Inc. v. Lockridge*, 2025 WL 2717319, at *7–8 (S.D. Ohio Sept. 24, 2025) (finding Rule 37(e)(2) sanctions warranted at least in part because the spoliating party gave "inconsistent and implausible testimony"); *Moody*, 271 F. Supp. 3d at 427 ("[A] court is not required to credit explanations for the loss of the relevant evidence that it finds incredible.") (citation omitted).

Additionally, most, if not all, of McKenna's deletions took place after he received the Plaintiffs' cease-and-desist letter, which unambiguously directed him to preserve all relevant evidence. (Doc. 59 at 86); (Doc. 62-15 at 5). Moreover, the letter made clear that it applied to both company *and* personal devices. (Doc. 62-15 at 5). Accordingly, even if the Court were to believe that McKenna thought that a computer belonged to him, he still knew that he had a duty to protect its contents. And although

McKenna maintains that he voluntarily ceased his spoliating activities after he deleted hundreds of files (Doc. 59 at 88–89), the Court cannot tell whether he did so to avoid making things worse or simply because he had already erased all the information he wanted to get rid of.

Finally, it bears noting that McKenna—like Rosas-Litourgis—is a sophisticated litigant. As discussed above, McKenna was a vice president at Scale and the third-highest ranking employee within the organization behind Hirsch and Rosas-Litourgis. *Id.* at 82–83. Further, as with Rosas-Litourgis, he was presumably involved at Scale with some level of assessing litigation risk. McKenna's professional experience and employment render his spoliation explanation even less credible.[12] *See Ronen v. RedRoute, Inc.*, 2025 WL 2790808, at *7 (E.D.N.Y. June 16, 2025) (finding a defendant's explanation not credible and imposing Rule 37(e)(2) sanctions because the "explanation [wa]s improbable at best" in light of the spoliators' professional experience); *Aramark*, 2021 WL 864067, at *16 (deeming the defendants' explanation for spoliation to be questionable after considering their professional background).

[12] McKenna's admitted unauthorized dissemination of the Plaintiffs' confidential information to third parties in the past does not help his credibility . *See* (Doc. 59 at 85); *see also Adler v. Sonotec US Inc.*, 2025 WL 2614993, at *3 (E.D.N.Y. Sept. 10, 2025) (stating that "district courts may make findings of fact and credibility determinations with respect to" Rule 37(e) sanctions and those determinations are treated with "strong deference") (citing *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 139–40 (2d Cir. 2023) and *Liebowitz v. Bandshell Artist Mgmt.,* 6 F.4th 267, 282 (2d Cir. 2021)); *see also Nuvasive*, 2023 WL 11910763, at *3 (collecting cases).

In sum, the Court finds that McKenna acted with an intent to deprive when he deleted the files from one or both of his company laptops and that the imposition of Rule 37(e)(2) sanctions against him is warranted as well.

IV.

The Court must now fashion the appropriate relief based on the above findings. Because it has determined that Rule 37(e)(2) applies to Rosas-Litourgis and McKenna and because the Rule 37(e) states that a court may pick sanctions under Rule 37(e)(1) "*or*" Rule 37(e)(2), the Court will focus first on Marciano for its 37(e)(1) remedies analysis and will then address Rosas-Litourgis and McKenna when assessing sanctions under Rule 37(e)(2). Fed. R. Civ. P. 37(e) (emphasis added).

The Plaintiffs limit their Rule 37(e)(1) request to attorneys' fees and expenses related to their sanctions motion, along with the forensic costs it sustained in attempting to recover the spoliated data. *See* (Doc. 61 at 25). Even though Rule 37(e)(1) does not expressly authorize monetary sanctions, courts in this Circuit and elsewhere have interpreted this provision as allowing for an award of fees and costs incurred in prosecuting sanctions motions as a remedy proportional to the spoliation. *See, e.g.*, *Willis*, 2023 WL 2918507, at *16 (finding a "monetary sanction" under Rule 37(e)(1) "appropriate") (collecting cases); *Skanska*, 340 F.R.D. at 191 (concluding that the movants were entitled to fees and costs incurred in bringing their sanctions motion under Rule 37(e)(1)): *Nationwide*, 2019 WL 5700288, at *5, 14 (finding that shifting attorney's fees and costs was appropriate and "no[t] greater than necessary to cure the prejudice" wrought by the spoliating party) (quoting Fed. R. Civ. P. 37(e)(1) and

collecting cases); *Paisley*, 330 F.R.D. at 237–38 (noting that "[m]any courts have imposed monetary sanctions under Rule 37(e)(1)") (citation omitted); *Borum v. Brentwood Vill., LLC*, 2019 WL 3239243, at *10 (D.D.C. July 18, 2019) (invoking Rule 37(e)(1) in ordering a spoliator to pay reasonable attorneys' fees and costs incurred in litigating the motion for spoliation sanctions).

In light of this case authority, the Court finds that the Plaintiffs are entitled to an award of reasonable attorneys' fees and costs incurred in prosecuting their sanctions motion against Marciano. (Doc. 45). Such costs shall include the monies expended by the Plaintiffs in forensically endeavoring to evaluate the lost ESI. *See Treminio v. Crowley Mar. Corp.*, 2024 WL 1075433, at *9–10 (M.D. Fla. Mar. 12, 2024) (ordering that the party must pay "the cost of a forensic examination" of her devices under Rule 37(e)(1)); *Nationwide*, 2019 WL 5700288, at *14 (including "costs associated with retaining [a] forensic expert, his evaluation, and the preparation of his report" in awarding attorney's fees and costs as part of Rule 37(e) sanctions). The amount to be paid by Marciano shall be determined at a later date.

With respect to the Rule 37(e)(2) sanctions, the Plaintiffs seek an adverse inference concerning the spoliated evidence. (Doc. 61 at 3). Given its findings of an intent to deprive relative to Rosas-Litourgis and McKenna, the Court agrees that such an adverse inference is warranted against these two Defendants to cure their destruction of the ESI on their company laptops. *See Nuvasive*, 2021 WL 3008153, at *7 ("Having found that [the d]efendants intentionally destroyed relevant evidence in this case, [and] that they did so with the intent to deprive [the p]laintiff of the ability

to use that evidence in this litigation, . . . [t]he [c]ourt may presume that the lost information was unfavorable to the [spoliating] party[.]") (citing Fed. R. Civ. P. 37(e)(2)).

The only remaining question is what the contours of that adverse inference are. As one court has observed, "[t]here are [three] different types of adverse inferences [available under Rule 37(e)(2)], each within increasing levels of harshness based on the nature of the spoliation." *Pete*, 2025 WL 3755435, at *17. The most severe is where the trier of fact is instructed that "certain facts are deemed admitted and must be accepted as true." *Id.* (citing *Skanska*, 340 F.R.D. at 191). The next most severe "results in the imposition of a mandatory, but rebuttable, presumption." *Id*. Finally, the least severe "allows the [trier of fact] to presume that the lost evidence is relevant and favorable to the innocent party." *Id*.

In both their sanctions motion and their proposed findings of fact and conclusions of law, the Plaintiffs request that the Court "presume that the lost evidence was unfavorable to the Defendants." (Doc. 61 at 22–23); *see also* (Doc. 45 at 22). In support of this language, the Plaintiffs cite Rule 37(e)(2)(A)'s text that "the Court *may* 'presume that the lost information was unfavorable to the party.'" (Doc. 61 at 22) (emphasis added) (citing Fed. R. Civ. P. 37(e)(2)(A)). Although it is not entirely clear whether the Plaintiffs are seeking the second or third option described above, their request most closely approximates the latter, and the Court will therefore assume that they wish the Court to adopt that option. *See Ala. Aircraft*, 319 F.R.D. at 746–47.

The Court recognizes, however, that this case is slated for a bench trial before the presiding district judge, the Honorable Kathryn Kimball Mizelle. (Doc. 44). "Thus, while the [Court] finds the[ above] adverse inference[ against Defendants Rosas-Litourgis and McKenna] to be an appropriate sanction based on the present record, . . . [that inference is] subject to [Judge Mizelle's] discretion and [her] determination of whether any rebuttal evidence will be allowed from [the sanctioned Defendants]." *Skanska*, 340 F.R.D. at 191 (citing *Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1302 (M.D. Fla. 2009) and *Optowave Co. v. Nikitin*, 2006 WL 3231422, at *12 (M.D. Fla. Nov. 7, 2006)).

Finally, the Court finds that as a further sanction accompanying the adverse inference, Rosas-Litourgis and McKenna should pay the reasonable attorneys' fees and costs (including the forensic costs referenced above) associated with prosecution of the Plaintiffs' sanctions motion, with the amount again to be computed at a later date. *See Ala. Aircraft*, 319 F.R.D. at 747 (finding monetary sanctions warranted in addition to an adverse inference under Rule 37(e)(2)); *Skanska*, 340 F.R.D. at 191 (same).

V.

Based upon the foregoing, it is hereby ORDERED that the *Plaintiffs' Motion for the Imposition of Sanctions for Spoliation of Evidence* (Doc. 45) is granted in part and denied in part as follows:

1. The Plaintiffs are entitled to reasonable attorneys' fees, costs, and forensic expenses incurred in the prosecution of their sanctions motion (Doc. 45) as it

relates to Defendants Leanna Marciano, Juliana Rosas-Litourgis, and Matthew McKenna.

2. No later than November 2, 2026, the Plaintiffs shall file a properly supported motion with affidavits and billing records appropriately detailing such fees and costs. And no later than November 16, 2026, the Defendants shall file a response to the Plaintiffs' motion, specifically contesting what, if any, fees and costs they deem to be unreasonable.

3. At trial, after reviewing all pertinent evidence, including any permitted rebuttal evidence, and subject to the presiding district judge's discretion, the presiding district judge may presume that the information spoliated by Defendants Rosas-Litourgis and McKenna is relevant and favorable to the Plaintiffs.

4. The Plaintiffs' motion is denied in all other respects.

SO ORDERED in Tampa, Florida, this 30th day of September 2026.

Christopher P. Tuite

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record